UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHELLEY P. BROWN,    6:11-cv-6380-TC

        Plaintiff,

                                             ORDER

        v.

PATRICK R. DONAHOE, POSTMASTER
GENERAL OF THE UNITED STATES
POSTAL SERVICE AND THE UNTIED
POSTAL SERVICE,

        Defendants.

COFFIN, Magistrate Judge:

    Plaintiff, Shelley Brown, brings this action alleging race and color discrimination, sex discrimination and retaliation for her complaints of race and color discrimination under both federal and state law. Plaintiff concedes that Title VII provides the exclusive remedy for the alleged discrimination. Accordingly, plaintiff's state law discrimination claims are dismissed. Defendant

Page 1 - ORDER

moves for summary judgment as to the remaining federal claims.

Plaintiff is an African American female who has been employed by defendant the United States Postal Service (USPS) for approximately 30 years. During her tenure with defendant, plaintiff made complaints of discrimination in 2004, 2010, and 2011. Plaintiff asserts that her 2004 complaint spurred the Portland District of the USPS for Oregon and Southwest Washington to implement initiatives for providing equality in employment. Consequently, plaintiff obtained the position of diversity coordinator in which she advised on diversity and equal employment opportunity (EEO) issues. As the diversity coordinator, plaintiff worked out of the USPS' Eugene plant. After a change of management at the district level, the diversity coordinator position was eliminated in 2009.

In 2010, plaintiff took a labor relations position at the USPS processing and distribution facility in Portland, Oregon. This position resulted from plaintiff's settlement of the 2010 EEO complaint. The position lasted for about 120 days.

In about June of 2010, plaintiff requested a lateral transfer into the supervisor of maintenance operations (SMO) position held by Dan Ehlers who was retiring at about that time. The position was not posted and at the end of June, Scott Foster, the manager of postal operations notified plaintiff that her request for the transfer was granted.[1] However, because plaintiff had not yet finished her labor relations position, she did not start the SMO job until October of 2010.

The government asserts that in 2010, Portland District maintenance manager lead, David Long, who coordinates the hiring policy and approvals, advised his managers in the district that he

---

[1] Plaintiff previously sought lateral transfers into an SMO position at the Eugene facility in 2001 and 2004.

Page 2 - ORDER

expected smaller facilities to have only one SMO working the day shift. The Eugene and Salem plants had not been employing this policy. At the time, the Eugene plant's three SMOs all worked the day shift. Long apparently complained to Eugene maintenance manager Barry Brenner and Eugene plant manager Robert Vore that there was not enough maintenance support for equipment problems during the swing and graveyard shifts.[2]

The government asserts that when Ehlers prepared to retire, plant manager Vore informed Brenner that he wanted the new SMO to work the evening shift because he felt that it was logical to have the SMO in charge of custodial maintenance in the evening shift because that SMO had two custodian group leaders assisting. The longest tenured SMO, Robert Hohenberger (in charge of technical machine repair and supervision of electrical technicians) was, according to Long, better suited for the day shift because that is when the mail processing machines were not running. The third SMO, Jesse Soto, was in charge of building/facilities maintenance. Brenner resisted, but apparently agreed to try a new schedule where the new custodial SMO would work a modified swing shift from 12:00 pm to 9:00 pm.[3]

As noted, at the time plaintiff's transfer request was granted, all three Eugene SMO's worked the day shift and Ehlers specifically worked from 7:30 am to 4:00 pm. Although there is a dispute

---

[2] It should be noted that Long was the Eugene plant manager in 2007 and 2008 and apparently complained then that Brenner did not have sufficient coverage for the swing and graveyard shifts, but despite his authority over Brenner, he chose not push for the shift changes while he was in Eugene because he asserts that Brenner was good about making sure a supervisor came to the plant whenever Long called.

[3] Defendant also asserts that the Salem plant was required to implement this new schedule for SMOs, but Long's deposition testimony is not clear on the issue. It appears to indicate that one SMO came in a little early to cover the end of the graveyard shift and worked into the regular day shift and the other SMO came in a little late to work into the swing shift. Deposition of David Long (attached to Declaration of Natalie K. Wright (#28)) at pp. 22, 43.

Page 3 - ORDER

about plaintiff's knowledge of the SMO duties in general and the specifics of the custodial SMO duties, it is undisputed that when Ehlers left, the position was temporally filled by Mike Swangle from June to October 2010 and he worked from 7:30 am to 4:00 pm. More importantly, plaintiff states that Brenner told her the hours for her would be the same when she took over. When plaintiff came to the Eugene plant to start work as the custodial SMO, she worked the day shift from 7:00 am to 4:00 pm. SMO Jesse Soto states that in June of 2010 after a district teleconference with Long, Vore, Brenner and Hohenberger, Long said:

> "I hope you are sitting down because your new maintenance supervisor is Shelly Brown." Vore responded, "I don't have a say in this." Long told him "no it has already been decided." The telephone conference then concluded and Long Hung up. Vore then turned to Brenner and said, "we will change her shift then and see how she likes that." Vore then left the meeting. I went to Brenner and told him that it was not right to change plaintiff's shift like that. I told Brenner that she will not put up with it just like none of use would put up with it. Brenner responded, "it won't change, don't worry about it."

Declaration of Jess Soto (#38) at ¶ 4.

On about November 4, 2010, Brenner notified plaintiff that her hours were being changed to the swing shift effective November 22, 2010. As a result, plaintiff worked different hours than the vast majority of employees she supervised shifting some of her duties such as overseeing tasks, accounting for workload and scheduling to non-supervisory employees. In addition, plaintiff was then required to supervise electricians, engineers and mechanics and assist in fixing equipment for which she was not trained. Moreover, plaintiff's new hours hindered her ability to attend manager meetings as the other SMOs and maintenance manger worked the day shift when the meetings were held.

In March of 2011, plaintiff filed another EEO complaint asserting discrimination based on

Page 4 - ORDER

race and sex and retaliation for her prior EEO activity due to the shift change. An investigation was conducted from April 2011 to August 2011. Soto notified Vore that he would be participating in the investigation and drafting an affidavit on plaintiff's behalf. Other Eugene facility employees participated as well.

Maintenance manager Brenner retired in June of 2011 and was replaced by acting maintenance manager Robert Atkinson. On June 27, 2011, Atkinson informed plaintiff that effective July 9, 2011, she would be placed on the graveyard shift. At that time, Atkinson also informed Soto that he would be placed on the swing shift.

On November 24, 2011, plaintiff filed another EEO complaint. Plaintiff retired from the USPS on October 1, 2012. Soto has also left the Eugene facility. Since plaintiff's retirement, no Eugene SMOs have been on the swing shift or graveyard shift.

### A.   Race and Sex Discrimination

To prevail on her disparate treatment claims alleging race and sex discrimination, plaintiff must demonstrate: (1) that she belonged to a protected class; (2) that she performed her job satisfactorily; (3) that she suffered an adverse employment action; and (4) that the USPS treated her differently than a similarly situated employee who does not belong to the same protected class as the plaintiff. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If plaintiff establishes a prima facie case, then defendant can rebut the presumption of discrimination that arises by producing evidence showing that defendant undertook the challenged employment action for a "legitimate, nondiscriminatory reason." Id. If defendant rebuts the presumption, then plaintiff can defeat summary judgment by offering evidence demonstrating the proffered explanation is a pretext

Page 5 - ORDER

for discrimination. See Warren v. City of Carlsbad, 58 F.3d 439, 443 (9th Cir. 1995) (to survive summary judgment, plaintiff must produce enough evidence to allow a reasonable fact finder to conclude either that the alleged reason for discharge was false, or that the true reason for the discharge was a discriminatory one).

Defendant argues it is entitled to summary judgment on these claims because plaintiff cannot establish an adverse employment decision or that other similarly situated employees were treated more favorably.

For purposes of Title VII discrimination, an adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment. Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008). In this case, viewing the evidence in a light favorable to plaintiff supports a conclusion that defendant: reassigned plaintiff to the swing shift and then graveyard shift; excluded her from some or even most of the impromptu management meetings; removed her from a majority of the employees she ostensibly supervised; required her to supervise employees in areas over which she had no experience or training; and required her to assist in duties for which she had no training such as fixing processing equipment. A trier of fact could conclude that defendant assigned plaintiff to more burdensome work which is an adverse employment action. See, id. (assigning more, or more burdensome work responsibilities, is an adverse employment action). Moreover, the exclusion from management meetings may also qualify as adverse. See id. at 1090 (suggesting that inviting male co-workers on the site to meetings while excluding the female plaintiff satisfies adverse action element and favorable treatment of non-protected class members element). In addition, defendant's argument that the graveyard shift actually benefitted plaintiff by increasing her pay to night pay actually suggests the opposite--that the night shift was reasonably

viewed as an adverse condition of employment (which necessitated more pay). There is no evidence that any of the other SMO's expressed a preference for such hours and they even suggest that it did not make sense to have all three shifts covered by an SMO.

Defendant makes much of the fact that plaintiff did not make herself fully aware of the particular duties of the SMO job and that the decision to change Ehlers' SMO position to a different shift was made prior to Ehlers' retirement. However, plaintiff has presented evidence that the decision was made after Vore became aware that plaintiff would be getting the job. Additionally, it is undisputed that the shift change for the custodial SMO position was actually implemented after plaintiff began working in the position. Moreover, it appears that now that plaintiff has retired, there are no SMOs working outside the day shift or at least have most hours within the traditional day shift time frame.[4] Plaintiff has produced sufficient evidence to raise an issue of fact with respect to whether she suffered an adverse employment action.

Plaintiff has also produced sufficient evidence for a trier of fact to conclude that the USPS treated her differently than a similarly situated male and/or Caucasian employees. Plaintiff argues and defendant has not rebutted that she is the first female to hold an SMO position at the Eugene facility and that the change in hours resulted in her exclusion from many management meetings that male SMOs were able to attend. An inference can be drawn that the motivation for this employment action was plaintiff's gender. Whether the other SMOs had greater experience or differing job

---

[4] It is unclear if this because of a policy change or because the positions (Soto's and plaintiff's) were not refilled. Defendant maintains that the only SMO in Eugene now is Hohenberger. However, it appears that the Salem facility has not implemented the change beyond scheduling the SMOs to come in a little early or stay a little late.

Page 7 - ORDER

duties[5] does not negate a finding that they were similarly situated to plaintiff.

In addition, when Ehlers held the job that plaintiff took over, despite Long's purported insistence that SMOs cover other shifts, none of the SMOs, who were male and Caucasian, worked outside the day shift. When other non-supervisory male and/or Caucasian employees filled in during absences by plaintiff, they did not work her hours, but worked the day shift as well. In addition, Mike Swangle, a Caucasian male employee who filled Ehlers's SMO position for several months while the Eugene facility awaited plaintiff's arrival, despite the alleged time policy change asserted by defendant, worked the day shift along with the other SMOs.[6]

It should be noted that of the approximately 11 supervisors at the Eugene facility, plaintiff was the only African American. Plaintiff has presented testimony from various employees that although they did not observe any outwardly concrete acts of discrimination, their personal observations of the way plaintiff was treated left them with the distinct impression that she was treated differently than non-African Americans performing the custodial SMO position. See, e.g., Deposition of Kathryn Gray (attached to declaration of Tonyia Brady (#39) as Exhibit 16) at pp. 17, 18, 26-27. Plaintiff has presented sufficient evidence to show an issue of fact as to whether the

---

[5] It is interesting to note that for purposes of job duties defendant argues that all SMOs have the same job description when arguing plaintiff did not suffer an adverse employment action, but then argues she is not similarly situated to the other SMOs, in part, because of their specialized knowledge in their respective areas of supervision. In addition, if the specialized knowledge of machinery by Hohenberger and specialized knowledge in facilities by Soto was so important as to remove them from being similarly situated, why did plaintiff get moved into a time shift were she was more likely to supervise employees in those areas than employees within the custodial speciality.

[6] Again, defendant argues that the employees filling in are not similarly situated because they are not actually SMOs. But they were temporarily performing not only as SMOs, but specifically as the custodial SMO and thus were literally performing plaintiff's job.

Page 8 - ORDER

USPS treated her differently than a similarly situated employee who does not belong to the same protected class as she does.

Having established a prima facie case, a rebuttable presumption that the employer unlawfully discriminated against plaintiff is created. Lyons v. England, 307 F.3d 1092, 1112 (9th Cir. 2002). The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. Id. If the employer meets this burden, the presumption of unlawful discrimination "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). Plaintiff then must produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000).

Plaintiff is not required, however, to produce additional independent evidence of discrimination at the pretext stage if the prima facie case raises a genuine issue of material fact regarding the truth of the employer's proffered reasons. Chuang v. University of California Davis, 225 F.3d 1115, 1127 (9th Cir. 2000). "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." Noyes v. Kelly Services, 488 F.3d 1163, 1170 (2007) (internal citation and quotation omitted). "[I]n the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence." Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1030 (9th Cir. 2006) (noting tension with the Godwin v. Hunt Wesson, Inc., 150 F.3d 1217 (9th Cir. 1998), line of cases and their standard requiring specific and substantial circumstantial

Page 9 - ORDER

evidence of pretext).

Defendant argues that its policy change regarding the SMO shifts was legitimate because it was expected by the Western Area officials for plants such as Eugene to have only one SMO on the day shift. The credibility of this explanation is called into question because a chief proponent, David Long, did not implement the policy when he was the Eugene plant manager. Indeed, even after plaintiff lateraled into the custodial SMO position, Soto and Hohenberger remained on the day shift until Soto was moved into swing after he officially sided with plaintiff in the April 2011 to August 2011 EEO investigation. This alone should be enough evidence of pretext.

Moreover, it appears the Salem plant did not implement the policy. Also as noted above, the policy was not followed when other workers at the Eugene facility filled in for plaintiff.[7] In addition, since plaintiff's departure, even though defendant argues it has not refilled Soto's and plaintiff's positions, SMOs work only the day shift in Eugene . Quite frankly, plaintiff's case is fairly strong and there is sufficient specific and substantial evidence for a trier of fact to ultimately conclude that plaintiff suffered unlawful discrimination on the basis of gender and race. Defendant's motion for summary judgment as to plaintiff's discrimination claims is denied.

B.  Retaliation

The McDonnell Douglas burden shifting framework also applies to a claim of retaliation under Title VII. To establish a prima facie retaliation claim, plaintiff must show: (1) involvement in a protected activity; (2) an adverse employment action taken against her; and (3) a causal link

---

[7]Defendant's argument that the only way it could get "volunteers" to fill in was by allowing them to work the day shift borders on the absurd and further demonstrates that the change to the graveyard shift was indeed an adverse employment action.

Page 10 - ORDER

between the two.   See Little v. Windermere Relocation, Inc., 301 F.3d 958, 969 (9th Cir. 2002).

Defendant concedes that plaintiff engaged in the protected activity of protecting her Title VII rights by filing EEO complaints. As noted above, plaintiff suffered adverse employment decisions. Moreover, the record is replete with evidence that nearly everyone in the Eugene plant was aware of plaintiff's EEO complaints.[8] In addition, there can be no dispute that relevant decision makers were aware of the investigation that was conducted in April 2011 to August 2011 which occurred prior to and during Atkinson's decision to place plaintiff on the graveyard shift and Soto (who supported plaintiff's EEO complaint) on the swing shift. At a minimum, the retaliation claim survives as to the graveyard shift employment decision.[9]

Defendant's argument that plaintiff was not dissuaded from filing further complaints ignores the objective nature of the adverse action element. A trier of fact could conclude that actions taken against plaintiff would dissuade a reasonable worker from making EEO complaints. There is

---

[8] While the employees at the plant used the word rumor to describe the knowledge, plaintiff relies on more than rumor and innuendo. Indeed, maintenance manager Barry Brenner had heard rumors that plaintiff had received the SMO position "because of an EEO complaint" after the phone call informing him of the hiring. Deposition of Barry Brenner (attached to Declaration of Tonyia Brady (#39) as Exhibit 15) at pp. 32-33. SMO Jesse Soto states that it was common knowledge at the Eugene plant that plaintiff had filed prior EEO complaints and that when she received the SMO position, rumors went around that she received the SMO position because of the complaints. Declaration of Jesse Soto (#38) at ¶ 5. In addition, Soto states that it was after that call informing Vore and Brenner that plaintiff had been hired that Vore stated "we will change her shift and then see how she likes that." Id. at ¶ 4. Plaintiff has presented evidence that Vore heard about the EEO complaints (even if it was made by someone who only thought it to be a rumor) at the very meeting in which he made the decision to change the shift.

[9] With respect to what constitutes an adverse employment decision for a retaliation claim, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, i.e., it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Moreover, The scope of the antiretaliation provision of Title VII extends beyond workplace-related or employment-related retaliatory acts and harm. Id. at 67.

Page 11 - ORDER

evidence that timing of the initial shift change decision by Vore may have occurred at the very time the "rumor" plaintiff got the job as a result of the EEO complaints was discussed. In addition, the second shift change occurred in the midst of another EEO investigation and ensnared another SMO who supported the EEO complaint. The timing of the decisions strongly suggests a correlation between the EEO complaints and the adverse employment decision. The evidence further suggests that defendant's proffered explanation is a pretext. The motion for summary judgment on the retaliation claims is denied.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment and to dismiss (#25) is granted to the extent that plaintiff's state law discrimination claims are dismissed and otherwise denied.

DATED this 16 day of September, 2013.

THOMAS M. COFFIN
United States Magistrate Judge